**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **IHP INDUSTRIAL, INC.,** | |
| **Plaintiff,** | **Case No. 2:15-cv-2932** |
| **v.** | **Judge Graham** |
| **C.J. MAHAN CONSTRUCTION COMPANY, LLC, et al.,** | **Magistrate Judge Jolson** |
| **Defendants.** | |

## OPINION & ORDER

This matter is before the Court on one defendant's motion to dismiss another defendant's cross-claims. Some of the cross-claims are well-pleaded and survive; others the Court will dismiss. The Court disposes of two ancillary motions in this order as well.

### I.  Background

American Municipal Power, Inc. ("AMP") agreed to pay C.J. Mahan Construction Company, LLC ("C.J. Mahan") about $200 million to build a hydroelectric facility (the "Project"). Three and a half years into the Project, when it was a little over halfway done, the parties' simmering conflict having risen to a boil, AMP and C.J. Mahan decided to go their separate ways.

Untangling the two parties' interests in the project was no simple task. C.J. Mahan as the prime contractor had millions of dollars of material and dozens of subcontractors on site. AMP had its own concerns about C.J. Mahan's quality of work. AMP and C.J. Mahan negotiated a new contract—the "Settlement Agreement"—that would wind down C.J. Mahan's involvement in the Project while allowing AMP to continue the work.

One of the subcontractors—IHP Industrial, Inc. ("IHP")—sued AMP, C.J. Mahan, and Liberty Mutual Insurance Company ("Liberty Mutual") in federal court, alleging it never received full payment for its work on the Project. C.J. Mahan answered, counterclaimed, and cross-claimed against AMP. AMP answered the Complaint, answered C.J. Mahan's cross-claims, cross-claimed against C.J. Mahan, and moved to dismiss seven of C.J. Mahan's nine

cross-claims. C.J. Mahan responded and also moved to amend its cross-claim to include another subcontractor, Aldridge Electric, as an additional party.

C.J. Mahan's cross-claims are for:

1) Declaratory judgment relating to retainage due to IHP; 2) Breach of the settlement agreement with respect to the Gracon Subcontract; 3) Declaratory judgment for subcontract work directed by AMP after C.J. Mahan's Date of Last Work; 4) Declaratory judgment for a delay claim of Aldridge Electric, Inc.; 5) Declaratory judgment relating to the Ellicott counterclaim; 6) Claim for breach of the settlement agreement; 7) Declaratory judgment relating to sales tax; 8) Declaratory judgment regarding claimed latent defects in the work; and 9) Breach of contract regarding the AMP latent defect claims. AMP moves to dismiss all but cross-claims eight and nine.

All of the cross-claims challenged by AMP depend in part on the Settlement Agreement. Some background on the Settlement Agreement between AMP and C.J. Mahan is in order.

Broadly, AMP agreed to pay C.J. Mahan for the work it did on the project until February 1, 2015. Article 1 of the Settlement Agreement draws a line at this date, a date the parties call the "Date of Last Work." (Settlement Agreement at Art. 1, Doc. 30). AMP & C.J. Mahan's construction contract then terminated at 5:00 p.m. on the Date of Last Work.

In Article 2, AMP agreed to pay C.J. Mahan a "Final Payment":

as full and final payment and complete and final settlement of all amounts to which C.J. Mahan is entitled or claims to be entitled from AMP in connection with the Project, the Contract, this Agreement, and . . . all other matters between AMP and C.J. Mahan including without limitation (1) all currently held retainage except for retainage associated with Subcontracts for which AMP elects to take assignment under Section 5.4 and (2) all amounts associated with any Work performed on or before the Date of Last Work.

(*Id.* at Art. 2.1).

And, in dividing up responsibility for payments to subcontractors:

AMP will be responsible for the payment to:

. . .

Subcontractors for which AMP does not take assignment for Work performed by those Subcontractors at the direction of AMP or its agents between the Date of Last Work and notification that AMP has rejected the assignment provided such Work for the period between the Date of Last Work and notification that AMP has rejected the assignment shall be invoiced to AMP within seven days after the

notice that AMP has rejected the assignment. AMP will notify any affected Sub-
contractors of this invoice timing requirement.

(*Id.* at Art. 2.1.4.2).

Article 2 provides further detail on how, when, on what terms, and on what conditions
C.J. Mahan would be paid. Specifically, after several smaller installments, AMP would pay the
balance of the Final Payment "minus the sum of the payments AMP makes as described under
Sections 5.2 and 5.3." (*Id.* at Art. 2.2.4.1). Articles 5.2 and 5.3 outline the process for making
payments to subcontractors.

Article 3 requires the parties to "work together in good-faith to transition the Project from
C.J. Mahan to AMP." (*Id.* at Art. 3). This Article includes plans to secure the Project site, inven-
tory materials, and assess the progress of the work.

Article 4 describes the procedure for transferring the project records from C.J. Mahan to
AMP, including the many permits required for the project.

Article 5 describes how the parties would unwind the web of subcontracts that C.J. Ma-
han made as the prime contractor on the project. This required two main agreements: how to pay
the subcontractors and how AMP would decide which subcontractors it would keep on the pro-
ject. C.J. Mahan was made responsible for "the payment of all amounts due to each Subcontrac-
tor for Work performed before the Date of Last Work as properly included in the Subcontractor's
payment applications or with respect to valid claims for additional compensation submitted in
accordance with the Subcontractor's subcontract." (*Id.* at Art. 5.1).  AMP was to issue payment
"in the form of a joint check to C.J. Mahan and that Subcontractor." (*Id.* at Art. 5.2). These pay-
ments to subcontractors reduced the amount of the Final Payment to C.J. Mahan.

C.J. Mahan needed to deliver to AMP a list of all subcontractors, "relevant information concern-
ing each subcontractor," and a waiver and release form for each subcontractor. (*Id.* at Art. 5.1,
5.4). After C.J. Mahan provided these items to AMP, AMP had five business days to notify C.J.
Mahan of whether it was electing to accept assignment of the subcontract or not. (*Id.* at Art. 5.4).
One of AMP's conditions was that "AMP and the Subcontractor reach an agreement concerning
the Subcontractor's continued participation in the Project that is acceptable to AMP in AMP's
sole discretion." (*Id.* at Art. 5.4.1). In the event that AMP's conditions were met, and AMP elect-
ed to take the assignment, "the assignment must cover the entire scope of that Subcontract. There
will be no partial assignment of any Subcontract . . . ." (*Id.* at Art. 5.5). If C.J. Mahan complied
with its duties under Article 5, AMP agreed to "indemnify, defend, and hold harmless C.J. Ma-

3

han and Liberty for any claim of a Subcontractor under a Ratified Subcontract, which claim arises out of or relates to acts, omissions, or events after the Date of Last Work." (*Id.* at Art. 5.8).

Article 6 describes the process for the removal of C.J. Mahan's equipment from the work site.

Article 7 describes AMP's purchase of C.J. Mahan's field office trailers.

Article 8 describes AMP's rental of a batch plant for processing concrete at the Project site.

Article 9 describes Liberty Mutual's payment bond obligations.

Article 10 describes the assignment, waiver, and release of claims. Broadly, it includes waiver-and-release language in favor of all parties with limited exceptions. It also includes a specific waiver of AMP's claims for defective or uncompleted punchlist work. Article 10 also includes an assignment of claims: C.J. Mahan assigned "to AMP all of C.J. Mahan's Project-related claims (if any) against any third party including without limitation all Subcontractors whose Subcontracts AMP took assignment of under this Settlement Agreement, all Separate Consultants, and all Separate Contractors (collectively 'Third-Party Claims')." (*Id.* at Art. 10.1).

Article 11 includes definitions, which refers to the construction contract between AMP and C.J. Mahan for a complete list of defined terms.

Article 12 includes general provisions like confidentiality, non-assignment, and integration clauses.

Article 13 is an enumeration of documents related to the Settlement Agreement. This list includes (1) waiver and release forms, (2) an escrow agreement form, (3) the batch plant rental agreement form, (4) a certificate of insurance, and (5) a list, with nothing on it, of exceptions to C.J. Mahan's representations under section 4.1.5 of the Settlement Agreement.


## II.  Standard of Review

Federal Rule of Civil Procedure 8(a) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  When considering a motion under Rule 12(b)(6) to dismiss a pleading for failure to state a claim, a court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A court should con-

4

strue the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. *Iqbal*, 556 U.S. at 679; *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007); *Twombly*, 550 U.S. at 555–56.

Despite this liberal pleading standard, the "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 555, 557 ("labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do," nor will "naked assertion[s]" devoid of "further factual enhancement[s]"); *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (a court is "not bound to accept as true a legal conclusion couched as a factual allegation").

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Though "[s]pecific facts are not necessary," *Erickson*, 551 U.S. at 93, and though Rule 8 "does not impose a probability requirement at the pleading stage," *Twombly*, 550 U.S. at 556, the factual allegations must be enough to raise the claimed right to relief above the speculative level and to create a reasonable expectation that discovery will reveal evidence to support the claim. *Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555–56. Analyzing whether a claim is plausible is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]'– 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

"[W]hen deciding a motion to dismiss a court may consider only matters properly a part of the complaint or pleadings." *Armengau v. Cline*, 7 F. App'x 336, 343 (6th Cir. 2001). "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). So, "when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007).

Here, the subcontract between IHP and C.J. Mahan, (Doc. 1-1), the Settlement Agreement, (Doc. 30), and the Construction of Powerhouse and Appurtenances Contract Documents, (Doc. 37-1), are all documents that are a part of the pleadings because they were either exhibits to pleadings or are central to the plaintiff's claims.

Rule 12(b)(1) permits dismissal for lack of subject-matter jurisdiction. Here, AMP implicates this Court's subject-matter jurisdiction by arguing that one of C.J. Mahan's cross-claims is not ripe. "Ripeness is more than a mere procedural question; it is determinative of jurisdiction. If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed." *Texas Gas Transmissions, LLC v. Butler Cty. Bd. of Comm'rs*, 625 F.3d 973, 976 (6th Cir. 2010) (quoting *Bigelow v. Mich. Dep't of Natural Res.*, 970 F.2d 154, 157 (6th Cir. 1992)).

## III. Discussion

The Court decides three motions: (1) AMP's motion to dismiss C.J. Mahan's cross-claims, (2) C.J. Mahan's motion to join Aldridge Electric, and (3) IHP's motion to dismiss claims against Liberty Mutual. The majority of the discussion that follows concerns the first motion.

### A. Declaratory judgment relating to retainage due to IHP

IHP and C.J. Mahan had a subcontract that called for IHP to perform $10,288,509.03 worth of work. (Compl. at ¶ 21). By the Date of Last Work, $6,429,623.10 of that had been completed or represented the value of stored materials. (*Id.*). "As of April 3, 2015, when IHP signed the Waiver and Release documents, IHP had received payments totaling $5,744,421.23." (*Id.* at ¶ 23). After the Date of Last Work, AMP directed IHP to perform about $500,000 worth of work, for which AMP paid. (C.J. Mahan's Cross-cl. at ¶¶ 39–40). AMP then rejected the assignment of the IHP subcontract and "attempted to remit payment for $685,201.87 by way of joint check to C.J. Mahan and IHP"—the balance owed to IHP. (Compl. at ¶¶ 26–28). Mahan released part of this sum to IHP—$317,639.54. (Compl. at ¶ 37). And later, Mahan released $50,000 more. (*Id.* at ¶ 38). IHP's claim stands at $317,562.33. (*Id.* at ¶ 56). That $317,562.33 is retainage—a portion of the contract balance, in this case 5% of the value of the completed work, held back by the owner. Retainage is "[a] common contract approach to reducing a contractee's risk that its contractor will fail to fully perform its contractual obligations is to withhold a percentage of the sums due until the work is substantially complete. This percentage is known as

"retainage.'" 3 Philip L. Bruner & Patrick J. O'Connor, Jr., *Construction Law* § 8:18 (2016) (Retainage) (footnotes omitted).

After IHP sued to recover this amount, C.J. Mahan cross-claimed against AMP, seeking a declaratory judgment that AMP and not C.J. Mahan was responsible for paying IHP's retainage. AMP now moves to dismiss this claim, arguing that it already issued a payment that covered the IHP retainage.

The Settlement Agreement is clear on this point—the Final Payment to C.J. Mahan was for, among other things, "all currently held retainage except for retainage associated with Subcontracts for which AMP elects to take assignment under Section 5.4." (Settlement Agreement at Art. 2.1). And all payments to subcontractors, including retainage payments, were deducted from of the Final Payment to C.J. Mahan. (*Id.* at Art. 2.2.4.1). So, C.J. Mahan had an interest in having AMP ratify as many of the subcontracts as possible.

Here are the parties' arguments. C.J. Mahan acknowledges that AMP never explicitly ratified the IHP subcontract but claims that AMP constructively ratified it. (C.J. Mahan's Cross-cl. at ¶ 46). Specifically, C.J. Mahan argues that AMP constructively ratified the subcontract when AMP directed IHP to perform about $500,000 worth of work within the scope of the original subcontract but then later refused to ratify the same subcontract. Moreover, this would amount to an end run around the Settlement Agreement, specifically Article 5.5, which prohibits partial assignments of subcontracts. C.J. Mahan also argues, in a similar vein, that AMP waived its right to reject assignment of the IHP subcontract by acting consistently with such an assignment.

AMP argues that the theory of constructive ratification has no applicability outside of the government-contracts context and the Settlement Agreement did not prohibit it from making new deals with existing subcontractors. Finally, AMP argues that Ohio law bars a claim for equitable relief when a litigant is a party to an express contract; thus, C.J. Mahan's argument regarding equitable estoppel fails.

Constructive ratification is inapplicable in this context. In some cases, the law doesn't require formal ratification to enter into a contract. For example, where a party's conduct is consistent with either an unsigned or unwritten agreement, courts may enforce the agreement as constructively ratified. *See, e.g.*, *Brown v. Lagrange Dev. Corp.*, 6th Dist. Lucas No. L–09–1099, 2015-Ohio-133, ¶ 12 ("It is not necessarily required for all parties to sign a contract for a valid enforceable contract to exist."); *Hocking Valley Cmty. Hosp. v. Cmty. Health Plan of Ohio*, 4th

Dist. Hocking No. 02-CA-28, 2003-Ohio-4243, ¶ 16 ("If one party failed to execute a written contract, yet the parties proceeded to act as if the contract was in effect, the contract is enforceable."). But here the executed, written contract—the Settlement Agreement—laid out exactly how AMP could ratify, or reject, a subcontract. AMP did not constructively ratify the IHP subcontract because its actions are actually contemplated by the parties' Settlement Agreement.

AMP's decision of whether to accept assignment of a subcontract was conditioned on C.J. Mahan delivering a list of all subcontractors, numerous documents, and waiver and release forms to AMP. C.J. Mahan alleges that it "transmitted to AMP copies of all subcontracts, related subcontract documents, and the majority of the project records." (C.J. Mahan's Cross-cl. at ¶ 21). Nowhere does C.J. Mahan allege that it submitted the required waiver and release forms. Without this, AMP was not under obligation to accept or reject an assignment.

To be fair, on April 3, 2015, IHP did execute two alternative waiver and release forms. (*See* Compl. Exs. B & C, Docs. 1-2, 1-3). But AMP required the waiver and release to "be on terms acceptable to AMP." (Settlement Agreement at Art. 5.1.1). The form waiver and release was attached to the Settlement Agreement as an exhibit. (*Id.* at Ex. A). Instead of signing the form waiver and release, IHP added a section "expressly reserv[ing] the right to seek and recover all amounts to which it may be entitled as a result of the circumstances surrounding the transition of this Project and IHP's subcontract, including but not limited to suspension or termination costs, engineering fees, interest, and legal expenses." (Compl. Exs. B & C at § 11.0). This reservation in the modified waiver and release submitted by IHP could include claims for "Work performed by each Subcontractor before the Date of Last Work," which was the intended subject of the form waiver and release. (Settlement Agreement at Art. 5.1). Since this reservation was not in the form waiver and release agreed to by AMP and C.J. Mahan, its delivery to AMP didn't satisfy the conditions that would trigger AMP's five-day window in which it had to accept or reject assignment of the subcontract. While AMP argues that the waiver and release IHP executed wasn't acceptable, AMP appears to have accepted it, per IHP's allegations, because it paid the amount listed in that waiver form. (IHP's Compl. at ¶ 27). But even if AMP did find the waiver and release acceptable, it didn't do so until April 21, 2015, at which point it declined to accept assignment of the IHP subcontract. (C.J. Mahan's Cross-cl. at ¶ 42). From the allegations, it appears AMP was within its rights to accept or reject assignment of the IHP subcontract.

But C.J. Mahan argues that it didn't owe AMP a waiver and release because the Settlement Agreement does not require it where there is no agreement between C.J. Mahan and the subcontractor on the amount due. This argument fails, and both the language of the Settlement Agreement and the IHP waiver and release show why. The Settlement Agreement says, "Except as described under Section 5.3 with regard to amount in dispute between C.J. Mahan and a Subcontractor, C.J. Mahan must deliver to AMP a waiver and release of all amounts due or claimed to be due . . . ." (Settlement Agreement at Art. 5.1). Article 5.3 actually contemplates a waiver and release being delivered even for subcontractors that dispute a portion of what they are owed. (*See id.* at Art. 5.3.2) ("AMP will pay the disputed portion into an escrow account established under an escrow agreement entered into between Liberty (as escrow agent), C.J. Mahan, and AMP ('Escrow Agreement'). Any payment made by AMP under this Section 5.3.2, will (1) satisfy any associated payment condition in the Subcontractor's Waiver and Release as to AMP . . . ."). IHP's waiver and release specifically mentions the amounts in dispute and reserves a claim for that amount. (Compl. Exs. B at ¶ 10, C at ¶ 10). In short, C.J. Mahan did owe to AMP a proper waiver and release to trigger the five-day subcontract-ratification-decision window. Until C.J. Mahan did so, AMP had no duty to make a ratification decision, so its behavior in the interim is entirely consistent with the process contemplated by the Settlement Agreement and not consistent with constructive ratification.

But was this a "partial assignment" that violated the Settlement Agreement? Article 5.5 says, "If AMP elects to take assignment of a Subcontract, the assignment must cover the entire scope of that Subcontract. There will be no partial assignment of any Subcontract . . . ." (*Id.*). In construing this and related language in the Settlement Agreement, the Court is to "ascertain the intent of the parties." *Aultman Hosp. Ass'n v. Cmty. Mut. Ins. Co.*, 46 Ohio St. 3d 51, 53, 544 N.E.2d 920, 923 (1989). And "[w]here the parties, following negotiations, make mutual promises which thereafter are integrated into an unambiguous written contract, duly signed by them, courts will give effect to the parties' expressed intentions." *Id.*

C.J. Mahan argues that by directing IHP to do some work and paying for it, but then rejecting the assignment, AMP attempted to modify the subcontract, or take a partial assignment of the subcontract and still avoid paying retainage. But the Settlement Agreement permitted AMP to work with subcontractors during the time after the Date of Last Work and the time that AMP notified C.J. Mahan that it was rejecting the assignment.

AMP will be responsible for the payment to:

. . .

.3      Subcontractors for which AMP does not take assignment for Work per-
formed by those Subcontractors at the direction of AMP or its agents between the
Date of Last Work and notification that AMP has rejected the assignment provid-
ed such Work for the period between the Date of Last Work and notification that
AMP has rejected the assignment shall be invoiced to AMP within seven days af-
ter the notice that AMP has rejected the assignment. AMP will notify any affected
Subcontractors of this invoice timing requirement.

(Settlement Agreement at Art. 2.1.4). C.J. Mahan argues that "the clear and obvious intent of

[this section] was merely to clarify that in the event a subcontractor was directed by AMP's on-

site personnel to perform some task on-site after [C.J. Mahan's] Date of Last Work, AMP, and

not [C.J. Mahan], would be responsible for the payment for that work." (C.J. Mahan's Resp. at

15). C.J. Mahan argues that to accept AMP's interpretation would mean that Article 5.5 has no

meaning at all. But Article 5.5 prohibits partial assignments of subcontracts if that subcontract is

assigned. And Article 2.1.4.3 permits AMP to direct, and pay for, work during the period be-

tween the Date of Last Work and its decision on whether to ratify a subcontract. These are not

inconsistent, and Article 2.1.4.3 does not render Article 5.5 a nullity.

The Settlement Agreement adopted a process where the work could continue, with AMP

footing the bill, until AMP made a decision of whether or not to accept assignment of the various

subcontracts. The timing of AMP's decision was tethered to C.J. Mahan's delivery of (1) a com-

plete list of all subcontractors, (2) relevant information for each subcontractor, and (3) signed

waiver and release forms. (*Id.* at Arts. 5.4.1, 5.4.3). C.J. Mahan does not allege that it delivered

all of these to AMP. And since AMP was within its rights under the contract to continue the

work while awaiting C.J. Mahan's delivery of these documents, it did not violate the Settlement

Agreement by directing IHP to do about $500,000 worth of its subcontract work.

C.J. Mahan makes one final argument—that the "distinct legal theory" of "waiver by es-

toppel" should prevent AMP from now denying that it ratified the IHP subcontract after it acted

consistently with acceptance of that same subcontract. (Resp. at 8). "'[W]aiver by estoppel' ex-

ists when the acts and conduct of a party are inconsistent with an intent to claim a right, and have

been such as to mislead the other party to his prejudice and thereby estop the party having the

right from insisting upon it." *Constr. Sys., Inc. v. Garlikov & Assoc., Inc.*, 10th Dist. Franklin No.

11AP–802, 2012-Ohio-2947, ¶ 47 (quoting *Mark-It Place Foods, Inc. v. New Plan Excel Realty*

*Trust*, 156 Ohio App. 3d 65, 2004-Ohio-411, 804 N.E.2d 979, ¶ 57 (4th Dist.)). C.J. Mahan argues that here, AMP's conduct communicated acceptance of the IHP subcontract, so AMP cannot now claim it had a right to reject assignment of that subcontract.

Here, C.J. Mahan does not allege with particularity any action by AMP that misled C.J. Mahan to its prejudice, particularly in view of Article 2.1.4.3 of the Settlement Agreement which gives AMP the authority to do exactly what it did. If the Settlement Agreement did not provide for this procedure, and if it did not outline the steps required to trigger the subcontract-assignment process, then C.J. Mahan's waiver-by-estoppel argument might work. But here, there's no allegation that AMP induced C.J. Mahan to adopt an injurious position by directing IHP to continue work while it awaited the documents from C.J. Mahan. In short, the equitable theory of waiver by estoppel has no application to these facts.

Since C.J. Mahan fails to allege that it triggered AMP's duty to decide whether to accept assignment of the subcontract, and a clear provision of the Settlement Agreement permits AMP to pay subcontractors who continue to work after the Date of Last Work, and no provision of the Settlement Agreement prohibits AMP from doing what it did, C.J. Mahan's claim fails. On this point, AMP did not breach a term of the Settlement Agreement, did not constructively ratify the assignment of the IHP subcontract, and did not waive the right to reject the assignment simply because it directed IHP to continue working between the Date of Last Work and the time that it rejected the assignment. To the extent Count One seeks a declaration on this issue, AMP's motion to dismiss is granted.

However, C.J. Mahan includes in Count One a request for declaratory judgment that "AMP is responsible for the payment of all retainage due to IHP" and that "AMP has not previously paid to Mahan the retainage due to IHP." (C.J. Mahan's Cross-cl. at ¶ 46). IHP alleges that AMP did attempt to remit the retainage to IHP. (Compl. at ¶¶ 48–49). If AMP elected to not accept assignment of the IHP subcontract, the Settlement Agreement obligated it to pay retainage due to IHP. IHP claims AMP "made an effort to remit the funds due," (*Id.* at ¶ 48), but IHP never received the full amount, (Compl. at ¶¶ 29–32).

There appears to be a factual dispute over the amounts paid to IHP. AMP alleges it paid the whole balance into an escrow account, and it doesn't deny that since it rejected the assignment of the IHP subcontract, it was required to pay IHP's retainage; indeed, it attempted to do so. (AMP's Answer to IHP's Compl. at ¶¶ 47–49, Doc. 20). C.J. Mahan denies IHP's allegation

that AMP paid it "and/or Liberty the full amount claimed by IHP." (Compl. at ¶ 49; C.J. Ma-
han's Answer to Compl. at ¶ 49). To the extent Count One seeks a declaratory judgment on this
disputed factual question, AMP's motion to dismiss is denied.

### B. Breach of the settlement agreement with respect to the Gracon Subcontract

C.J. Mahan alleges that it paid one of its subcontractors, Gracon, about $90,000 in re-
tainage, but AMP would have had to pay the retainage if it had accepted the assignment of the
Gracon subcontract. Instead of ratifying the assignment of the Gracon subcontract, AMP at-
tempted to negotiate new terms with Gracon, an effort that ultimately failed. AMP did not ratify
the Gracon subcontract. C.J. Mahan argues that "had AMP not attempted to negotiate new com-
mercial terms with Gracon as part of its decision on ratification, the subcontract would have been
ratified." (C.J. Mahan's Resp. at 25). Thus, C.J. Mahan argues, AMP breached the settlement
agreement.

AMP argues that what C.J. Mahan alleges doesn't amount to a breach of contract because
the Settlement Agreement doesn't prohibit AMP from negotiating with subcontractors. Plus,
AMP argues, C.J. Mahan can't show it suffered any damages, because even per C.J. Mahan's
admission, AMP and Gracon never came to an agreement.

"Under Ohio law, contract interpretation is a matter of law when a contract's terms are
clear and unambiguous." *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006). "To
establish a breach of contract, a plaintiff must show that a contract existed, the plaintiff per-
formed, the defendant breached, and the plaintiff suffered damages." *Id.* (analyzing breach of
contract in the context of a motion for summary judgment). But if a decision turns on contract
interpretation, and the contract language is ambiguous, it would be improper to dismiss the
claim. *See, e.g.*, *Jimenez v. Allstate Indem. Co.*, No. CIV. 07-14494, 2009 WL 440958, at *2
(E.D. Mich. Feb. 23, 2009).

C.J. Mahan's claim fails because it gave AMP all the cards; the Settlement Agreement
allowed AMP—at its discretion—to take assignment of the subcontracts or not. C.J. Mahan
points to no specific provision of the Settlement Agreement that prohibited AMP from doing
what it did. To be sure, C.J. Mahan "had a vested interest in AMP ratifying the assignment of as
many of the subcontracts as possible as AMP would thereby become responsible for the payment
of the retainage due to the subcontractors whose subcontracts were ratified." (C.J. Mahan's Resp.
at 21–22). But AMP had the right to not accept assignment of the subcontract; it just had to pay

any retainage it held. C.J. Mahan points to no provision of the Settlement Agreement that prohibits AMP from negotiating with subcontractors.

Finally, C.J. Mahan's allegations of damages fall short. C.J. Mahan alleges that AMP would have accepted assignment—and had to pay the retainage—if it had never tried to negotiate with Gracon. But this is too speculative, especially considering the fact that after AMP failed to negotiate a deal to its liking, it still could have ratified the Gracon subcontract, but it did not. This alone refutes C.J. Mahan's own allegations of damages. Since C.J. Mahan "must do more than create speculation or suspicion of a legally cognizable cause of action," *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007), to survive a motion to dismiss, and it has not done so with its second cross-claim, C.J. Mahan's second cross-claim is dismissed.

### C.  Declaratory judgment for subcontract work directed by AMP after C.J. Mahan's Date of Last Work

Immediately after the Date of Last Work, the various subcontractors on the Project site were left with no prime contractor from whom to seek direction. During this time, the subcontractors on-site spent money "on stand-by." AMP didn't ratify some subcontracts; those subcontractors incurred costs to "demobilize."[1] C.J. Mahan wants the Court to declare that AMP is responsible for the amount due to the subcontractors for costs they incurred after the Date of Last Work. C.J. Mahan also claims AMP should pay for some re-bar that was installed but wasn't invoiced to AMP prior to the Date of Last Work.

#### i.  Rebar costs

Before the Date of Last Work, a subcontractor—Harmon Steel, Inc.—installed some rebar on the Project. AMP's engineer determined that the work wasn't "complete" until the rebar was encased in concrete by another subcontractor. (C.J. Mahan's Cross-cl. at ¶ 67; AMP's Answer to C.J. Mahan's Cross-cl. at ¶ 67). So, by the Date of Last Work, neither Harmon Steel nor C.J. Mahan included that work on any payment application. (C.J. Mahan's Cross-cl. at ¶ 67). Now AMP won't pay the bill because it argues that while the work wasn't "complete," it was "performed" before the Date of Last Work, which would make C.J. Mahan liable to Harmon Steel. AMP's first conclusion that the work wasn't "complete" and its second conclusion that the

---

[1] C.J. Mahan mentions four subcontractors in its third cross-claim—IHP, Gracon, Harmon Steel, Inc., and a company called NSE—but of these subcontractors, only IHP is a party to this lawsuit.

work wasn't performed are in tension. The facts as C.J. Mahan alleges present a plausible claim for relief.

The Settlement Agreement provides that C.J. Mahan would accept a final payment of all amounts to which C.J. Mahan was entitled, including "all amounts associated with any Work performed on or before the Date of Last Work." (Settlement Agreement at Art. 2.1). C.J. Mahan was then "responsible for the payment of all amounts due to each Subcontractor for Work performed before the Date of Last Work as properly included in the Subcontractor's payment applications or with respect to valid claims for additional compensation submitted in accordance with the Subcontractor's Subcontract." (*Id.* at Art. 5.1). To trigger the payment requirements of Article 2 of the Settlement Agreement, C.J. Mahan was required to "deliver to AMP a waiver and release of all amounts due or claimed to be due . . . from each of C.J. Mahan's existing Subcontractors . . . for all Work performed by each Subcontractor before the Date of Last Work." (*Id.*).

AMP argues that the Settlement Agreement didn't require work to be complete to have C.J. Mahan be liable, only that the work be "performed" before the Date of Last Work. But the next phrase of Article 5.1 is instructive: "as properly included in the Subcontractor's payment applications." (*Id.*). C.J. Mahan alleges that AMP itself said that the work was not properly included in Harmon Steel's payment application before the Date of Last Work. Regardless of whether it was "completed" or "performed," AMP itself represented that the work couldn't be properly included in the payment application.

AMP also argues that the work was properly included on Harmon Steel's payment application to C.J. Mahan, just not on Mahan's payment application to AMP. C.J. Mahan's claims don't specify which company's payment application AMP rejected, but C.J. Mahan alleges that Harmon didn't include it on a payment application because AMP determined the work was not yet "complete." (C.J. Mahan's Cross-claim at ¶ 67). Reasonable inferences could cut both ways on C.J. Mahan's allegations, but the Court is called to resolve all reasonable inferences in favor of the non-moving party—C.J. Mahan. That being so, if AMP's engineer represented to Harmon Steel that it could not properly include the bill for the rebar in a payment application, then that amount plausibly falls outside of C.J. Mahan's responsibility per Article 5.1. C.J. Mahan has stated a viable claim for relief, and on this point, AMP's motion to dismiss is denied.

### ii. Demobilization and stand-by costs

Subcontractors were left in an uncertain situation by AMP and C.J. Mahan's dispute, especially around the Date of Last Work when C.J. Mahan turned the project over to AMP. They had to "stand-by," awaiting orders, and the subcontractors whose subcontracts AMP did not ratify incurred costs to "demobilize" and leave the work site. C.J. Mahan seeks a declaratory judgment that AMP is responsible for all the "stand-by" and "demobilization" costs incurred by subcontractors after the Date of Last Work.

The parties divided the costs at the Date of Last Work, but the Settlement Agreement doesn't specifically mention how the parties would account for "stand-by" or "demobilization" costs:

2.1.4 AMP will be responsible for the payment to:

….

.2 Subcontractors with Ratified Subcontracts for Work performed and invoiced after the Date of Last Work; and

.3 Subcontractors for which AMP does not take assignment for Work performed by those Subcontractors at the direction of AMP or its agents between the Date of Last Work and notification that AMP has rejected the assignment provided such Work for the period between the Date of Last Work and notification that AMP has rejected the assignment shall be invoiced to AMP within seven days after the notice that AMP has rejected the assignment. AMP will notify any affected Subcontractors of this invoice timing requirement.

….

5.1 C.J. Mahan shall be responsible for the payment of all amounts due to each Subcontractor for Work performed before the Date of Last Work as properly included in the Subcontractor's payment applications or with respect to valid claims for additional compensation submitted in accordance with the Subcontractor's Subcontract.

(Settlement Agreement at Arts. 2.1, 5.1).

AMP argues that it is only liable for work that AMP directed and the subcontractor invoiced. But C.J. Mahan alleges that AMP directed the subcontractors to "stand-by" by giving no instruction after C.J. Mahan was no longer the prime contractor on the project, (C.J. Mahan's Cross-cl. at ¶ 64), and AMP expressly directed the subcontractors to demobilize—to remove their materials and equipment from the site, (*id.* at ¶ 62). AMP argues that C.J. Mahan doesn't

allege that any of the subcontractors invoiced AMP for those costs within seven days after receiving notice that AMP rejected the assignment. But C.J. Mahan alleges that some of the affected subcontractors did assert claims for costs incurred to stand-by. (*Id.* at ¶ 64). And in any event, AMP does not point to allegations that it provided the required notice to the affected subcontractors, a notice that was important because it included the invoice-timing requirement that AMP now asserts the demobilized subcontractors didn't meet. (*See* Art. 2.1.4.3).

Generally, the Settlement Agreement divided payments to subcontractors into two parts: before and after the Date of Last Work. (*See id.* at Art. 2.1). The allegations are muddy as to whether the parties met their obligations imposed by the Settlement Agreement for payments that aren't specifically contemplated in the Settlement Agreement. But if the facts C.J. Mahan alleges are true, the subcontractors' stand-by and demobilization costs could be AMP's responsibility, so C.J. Mahan states a plausible claim for relief.

### D. Declaratory judgment for delay claim of Aldridge Electric, Inc.

C.J. Mahan alleges that one of its subcontractors—Aldridge Electric, Inc.—asserts a claim for delays on the Project that occurred after the Date of Last Work. C.J. Mahan wants the Court to declare that Aldridge Electric's claim is AMP's responsibility. In an ancillary motion, C.J. Mahan moves to join Aldridge Electric as a party.

But Aldridge Electric has already sued C.J. Mahan (and Liberty Mutual) in state court for a claim based on project delay. (Ex. A to AMP's Reply, hereinafter "Aldridge Electric's State-Court Compl., Doc. 42-1). In the state-court case, C.J. Mahan argued that the court should stay Aldridge Electric's claims while this Court determined whether AMP or C.J. Mahan should answer for those claims. C.J. Mahan argues that a declaratory judgment from this Court deciding whether C.J. Mahan or AMP is the "real party in interest" to defend Aldridge Electric's claim is the most efficient way to proceed.

To decide this issue, the Court starts with the Settlement Agreement, which says,

> 5.8    Provided that C.J. Mahan has complied with its obligations under Sections 5.1, 5.3, and 5.4, AMP will indemnify, defend, and hold harmless C.J. Mahan and Liberty for any claim of a Subcontractor under a Ratified Subcontract, which claim arises out of or relates to acts, omissions, or events after the Date of Last Work. AMP will have no obligation to indemnify, defend, or hold harmless C.J. Mahan or Liberty for any claim arising out of or related to the acts or omissions of C.J. Mahan whether such acts or omissions are before or after the Date of Last Work.

(*Id.*).

C.J. Mahan alleges that there were delays to the work of Aldridge Electric stemming from activity both before and after February 1, 2015—the Date of Last Work. But Aldridge Electric's complaint seeks breach-of-contract damages for "breaches of the subcontract between Mahan and Aldridge [that] occurred before February 1, 2015." (Aldridge Electric's State-Court Compl. at ¶ 12). And while C.J. Mahan argues that whether the claim arises before or after the Date of Last Work is a matter for the trier of fact to decide, (C.J. Mahan's Resp. at 32), as pleaded, Aldridge Electric's claim is solely for breaches of contract that arose before the Date of Last Work. The only question is whether AMP's duty to defend C.J. Mahan extends to Aldridge Electric's claim.

AMP only agreed to "indemnify, defend, and hold harmless C.J. Mahan and Liberty for any claim of a Subcontractor under a Ratified Subcontract, which claim arises out of or relates to acts, omissions, or events after the Date of Last Work." (Settlement Agreement at Art. 5.8). Aldridge Electric's claim arises out of events that occurred before the Date of Last Work per its state-court complaint. Therefore, the unambiguous terms of the Settlement Agreement do not require AMP to indemnify, defend, and hold harmless C.J. Mahan for Aldridge Electric's claim.

To the extent C.J. Mahan seeks a declaration for any claim by Aldridge Electric for delay arising *after* the Date of Last Work, this claim is unripe because Aldridge Electric has not raised such acclaim—either here or in state court. "Ripeness is a justiciability doctrine designed 'to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements.'" *Ky. Press Ass'n, Inc. v. Kentucky*, 454 F.3d 505, 509 (6th Cir. 2006) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985)). "If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed." *Bigelow v. Mich. Dep't of Nat. Res.*, 970 F.2d 154, 157 (6th Cir. 1992) (quoting *Southern Pac. Transp. Co. v. City of Los Angeles*, 922 F.2d 498, 502 (9th Cir. 1990)). Seeking a declaratory judgment assigning liability for an as-of-yet-unmaterialized claim implicates the ripeness doctrine. Since Aldridge Electric only asserts claims arising before the Date of Last Work, C.J. Mahan fails to state a claim for declaratory judgment. Therefore, C.J. Mahan's fourth cross-claim is dismissed.

Accordingly, C.J. Mahan's motion for leave to amend its cross-claim to join Aldridge Electric is denied as moot.

### E.  Declaratory judgment relating to the Ellicott counterclaim

Ellicott Dredges built a dredge—a machine used for underwater excavation—for C.J. Mahan to use in its underwater excavation business, and C.J. Mahan used the dredge on the Project. But the dredge didn't work as expected, and C.J. Mahan complained to Ellicott. Ellicott sent C.J. Mahan replacement parts and asked for the original, and allegedly defective, parts back, but C.J. Mahan never returned the original parts. Ellicott sued C.J. Mahan in federal court in Maryland. *See Ellicott Dredges, LLC v. C.J. Mahan Construction Co., LLC*, 1:14-cv-3557 (D. Md.).[2] C.J. Mahan counterclaimed for "damages associated with the manufacturing and design defects associated with the dredge, as well as damages arising from the failure of the dredge to achieve the production rates represented by Ellicott pre-sale." (C.J. Mahan's Cross-cl. at ¶ 114); (*see also* AMP's Mot. to Dismiss Ex. B, Doc. 25-2). Now C.J. Mahan seeks a declaratory judgment in federal court in Ohio, stating that,

> 1) the Mahan Counterclaims against Ellicott is (sic) not a "Project Related Claim" under the Settlement Agreement, 2) the Mahan Counterclaims against Ellicott is (sic) not a "Third-Party Claim" under the Settlement Agreement, and 3) Mahan is the sole and exclusive owner of the Counterclaims against Ellicott. In the alternative, in the event that the Court were to determine that AMP is the owner of the Mahan Counterclaims, Mahan seeks a declaratory judgment that AMP is responsible for 100% of the attorneys' fees, costs and expenses incurred by Mahan to date with respect to the Ellicott lawsuit and that AMP has an obligation to indemnify, defend and hold harmless Mahan from any and all claims asserted by Ellicott.

(C.J. Mahan's Cross-cl. at ¶ 119).

The parties' dispute focuses on Article 10.1 of the Settlement Agreement, which says, "C.J. Mahan hereby assigns to AMP all of C.J. Mahan's Project-related claims (if any) against any third party including without limitation all Subcontractors whose Subcontracts AMP took assignment of under this Settlement Agreement, all Separate Consultants, and all Separate Contractors (collectively "Third-Party Claims")." (Settlement Agreement at Art. 10.1). The parties dispute (1) whether the list of examples following the phrase "including without limitation" limit's the assignment of "all of C.J. Mahan's Project-related claims," and (2) whether the Ellicott counterclaim is a "Project-related claim" within the meaning of the Settlement Agreement.

---

[2] The Maryland district court granted the parties' motion for voluntary dismissal, but that was pursuant to a joint status report that describes the parties' agreement to voluntarily dismiss the case while awaiting this Court's order. *See Ellicott Dredges*, 1:14-cv-3557 (Docs. 57, 59).

AMP argues that Ohio courts construe phrases that include a broad term like "including without limitation" to not be limited by any list of examples that follow. *See State v. Thompson*, 92 Ohio St. 3d 584, 588, 752 N.E.2d 276, 280 (2001) ("The phrase 'including, but not limited to' 'indicates that what follows is a nonexhaustive list of examples.'" (quoting *State v. Lozano*, 90 Ohio St. 3d 560, 562, 740 N.E.2d 273, 275(2001))).

C.J. Mahan argues that the list following "including without limitation" does limit the phrase, "any third party." That is, Ellicott is not a "Separate Consultant, Separate Contractor, or a Subcontractor;" therefore, C.J. Mahan didn't assign to AMP its claim against Ellicott through Article 10.1 of the Settlement Agreement. It offers two cases in support, neither of which is binding authority on this Court. *See Shelby Cty. State Bank v. Van Diest Supply Co.*, 303 F.3d 832, 837 (7th Cir. 2002) ("[I]t would be bizarre as a commercial matter to claim a lien in everything, and then to describe in detail only a smaller part of that whole."); *In re Clark*, 154 N.H. 420, 423, 910 A.2d 1198, 1200 (2006) ("When the legislature uses the phrase 'including, but not limited to' in a statute, the application of that statute is limited to the types of items therein particularized."). Both *Shelby County* and *In re Clark* occurred in markedly different factual contexts, but to the extent they are similar the Court is neither bound nor persuaded by the reasoning of either court. In any event, there's a reason C.J. Mahan had to go outside of Ohio for these cases: in Ohio, "[t]he phrase 'including, but not limited to' 'indicates that what follows is a nonexhaustive list of examples." *Thompson*, 92 Ohio St. 3d at 588 (quoting *Lozano*, 90 Ohio St. 3d at 562); *see also Colbert v. Cleveland*, 99 Ohio St. 3d 215, 2003-Ohio-3319, 790 N.E.2d 781, ¶ 14 ("Examples are typically intended to provide illustrations of a term defined in the statute, but do not act as limitations on that term.") (construing the Ohio Revised Code). Applying Ohio law as the parties elected to do, (Settlement Agreement at Art. 12.15), the phrase following "without limitation" does not limit the assignment of claims.

C.J. Mahan argues, finally, that the Ellicott counterclaim is not project related. "Project" is a term defined by the parties: "The total construction of which the Work may be the whole or a part as indicated elsewhere in the Contract. Also referred to as or used in conjunction with 'Plant' and 'Facility.'" (AMP's Resp. Ex. A., Construction Contract Documents at § 1.1.58, Doc. 37-1). "Related" is not defined by the parties, but has a broad meaning: "[c]onnected in some way; having relationship to or with something else." *Related*, Black's Law Dictionary (10th ed. 2014). C.J. Mahan alleges it used the dredge on the project, and "[d]uring the tenure of the

dredge on the Project," Ellicott provided replacement parts for the dredge. (C.J. Mahan's Cross-cl. at ¶ 113). "Mahan has asserted a counterclaim against Ellicott for damages associated with the manufacturing and design defects associated with the dredge, as well as damages arising from the failure of the dredge to achieve the production rates represented by Ellicott pre-sale (the 'Counterclaims')." (*Id.* at ¶ 114).

The parties argue this point as an all-or-nothing proposition—either the whole counterclaim is project related, or it isn't. The Court doesn't see it that way. The Ellicott counterclaim is "project related" to the extent that the damages sought are connected in some way to the construction of the Project. It would not make sense to award AMP the entire counterclaim to recover part of the purchase price of a piece of equipment with a useful service life in excess of 30 years. (*See* C.J. Mahan's Cross-cl. at ¶ 101). Any contractor's cost of equipment, whether rented or owned, is passed through to the owner of the project. But of course, if the useful life of the equipment extends beyond the time of project, the contractor only passes through part of the cost of that equipment. If AMP got its way, it would essentially have paid to rent the dredge, paid C.J. Mahan to operate it, but also get to recover against the dredge manufacturer for defects in design and manufacture akin to a partial refund of the purchase price it never paid. Part of the Ellicott counterclaim appears to be project related; part of it does not.

The extent to which either party owns the Ellicott counterclaim is a question of how much of that claim is project related, which is a fact-intensive question that is impossible to answer at this point. C.J. Mahan has alleged facts sufficient to state a claim for a declaratory judgment that it owns at least part of the Ellicott counterclaim; therefore, AMP's motion to dismiss this claim is denied.[3]

But alternatively, C.J. Mahan seeks, "in the event that the Court were to determine that AMP is the owner of the Mahan Counterclaims, Mahan seeks a declaratory judgment that AMP is responsible for 100% of the attorneys' fees, costs and expenses incurred by Mahan to date with respect to the Ellicott lawsuit and that AMP has an obligation to indemnify, defend and hold harmless Mahan from any and all claims asserted by Ellicott." (C.J. Mahan's Cross-cl. at ¶ 119). This issue has not been briefed, and the Court declines to grant AMP's motion to dismiss this alternative claim.

---

[3] If AMP believes it is entitled to part of the Ellicott counterclaim, it could intervene in the Maryland case.

### F.  Claims for breach of the settlement agreement

C.J. Mahan pleads its claims for declaratory judgment in the alternative as claims for breach of contract, specifically, for breach of the Settlement Agreement. These claims require no independent analysis. To the extent the predicate claims survive dismissal, the alternative breach-of-contract claims survive as well.

### G.  Declaratory judgment relating to sales tax

C.J. Mahan seeks a declaratory judgment that AMP is liable for any and all sales tax assessed on rental equipment used on the Project and that AMP must indemnify, defend, and hold harmless C.J. Mahan for any claims for sales tax assessed on rental equipment. (C.J. Mahan's Cross-cl. at ¶¶ 134–35). C.J. Mahan alleges that some equipment suppliers are asserting claims for unpaid sales tax against C.J. Mahan. AMP operated under the understanding that the project would be tax exempt, but Kentucky disagreed, and AMP now states it will "pay the Kentucky sales taxes assessed for rental equipment (for which an operator was not provided) on the Project." (AMP's Answer to Cross-cl. at ¶ 135). Because of this statement, AMP asks the Court to declare C.J. Mahan's cross-claim moot. But C.J. Mahan does not want to relinquish its claim on AMP's word alone. And AMP doesn't want to concede C.J. Mahan's cross-claim because AMP does not want to agree to an unknown liability. The parties' construction contract clearly dictates that AMP will be liable for any sales tax should the project not be tax exempt. (C.J. Mahan's Cross-cl. at ¶ 129). C.J. Mahan has stated a claim; therefore, AMP's motion to dismiss is denied.

### H.  IHP's unopposed motion for partial dismissal with prejudice of certain claims (Liberty Mutual only)

IHP represents that it has reached a settlement with Liberty Mutual on terms that provide for IHP to dismiss its claims against Liberty Mutual with prejudice but without affecting any of IHP's other claims in this action. Accordingly, IHP moves to dismiss Liberty Mutual. (Doc. 45). The motion is unopposed. The Court grants IHP's motion for dismissal of claims against Liberty Mutual.

## IV.  Conclusion

AMP's motion to dismiss C.J. Mahan's cross-claims is **GRANTED IN PART AND DENIED IN PART**. (Doc. 25).

C.J. Mahan's motion for leave to amend its cross-claim to join Aldridge Electric, Inc., *instanter* is **DENIED**. (Doc. 41).

Plaintiff IHP's motion to dismiss its claims against Liberty Mutual. IHP's motion is **GRANTED**. (Doc. 45).

IT IS SO ORDERED.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: December 9, 2016